Robert L. Parker, Ph.D.
5468 Collier Avenue
San Diego, CA 92115
505-554-6507 (mobile)
no fax

Plaintiff in pro per

# UNITED STATES DISTRICT COURT

# IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT L. PARKER, PH.D., an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF SAN DIEGO;<br>JOSH MAYS, an individual;<br>JONATHAN BECERRA, an individual;<br>CARRIE HOGAN, an individual;<br>NORMA CRUZ, an individual;<br>PAUL MCCLAIN, an individual;<br>TRACI STECKLER, an individual;<br>ANTHONY CALVERT, an individual;<br>DOES 1-50, individuals;<br><br>        Defendants. | 3:24-cv-00518-JES-DDL<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1) **MALICIOUS PROSECUTION (42 U.S.C. § 1983) AGAINST POLICE DEFENDANTS**<br>2) **INJUNCTIVE RELIEF (abandoned)**<br>3) **MALICIOUS PROSECUTION (42 U.S.C. § 1983) MONELL AGAINST CITY OF SAN DIEGO**<br>4) **MALICIOUS PROSECUTION (42 U.S.C. § 1983) AGAINST PROSECUTORIAL DEFENDANTS**<br><br>Judge: Hon. James E. Simmons, Jr.<br>Date Filed: 03/18/2024 |

<u>Changes from First Amended Complaint ("FAC") filed May 2, 2024</u>

1. Defendants SDSUPD and mis-named "Regents of CSU" are removed from the caption and action against them is abandoned per the court's ruling filed July 9, 2024.

2. Plaintiff abandons his request for injunctive relief which was stated as the Second Cause of Action.

3. Plaintiff split the First Cause of Action into First, Third, and Fourth Causes of Action according to SDSUPD Defendants, The City of San Diego (Monell claim), and prosecutorial Defendants, respectively.

4. For cross-referencing with the FAC, each retained or modified paragraph is marked according to its initial paragraph numbering in the FAC, e.g. "[FAC ¶ 1.]"

5. Paragraphs not notated as "FAC ¶" are new paragraphs in this SAC, providing detail supporting allegations from the FAC.

## INTRODUCTION AND GENERAL ALLEGATIONS

1. [FAC ¶ 1.] To make out a Fourth Amendment malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must show that legal process was instituted without probable cause. *Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022).

2. [FAC ¶ 2.] At the relevant times of the arrest and prosecution of Plaintiff, the relevant statute stated as follows:

3. [FAC ¶ 3.] § 626.6. Power to direct person to leave campus; Punishment for refusal to comply.

(a) If a person who is not a student, officer or employee of a college or university and who is not required by his or her employment to be on the campus or any other facility owned, operated, or controlled by the governing board of that college or university, enters a campus or facility, and it reasonably appears to the chief administrative officer of the campus or facility, or to an officer or employee designated by the chief administrative officer to maintain order on the campus or facility, that the person is committing any act

likely to interfere with the peaceful conduct of the activities of the campus or facility, or has entered the campus or facility for the purpose of committing any such act, the chief administrative officer or his or her designee may direct the person to leave the campus or facility. If that person fails to do so or if the person willfully and knowingly reenters upon the campus or facility within seven days after being directed to leave, he or she is guilty of a misdemeanor and shall be punished as follows: [Sections (a)(1), (a)(2), (a)(3) address punishment and are omitted];

(b) The provisions of this section shall not be utilized to impinge upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly.

(c) When a person is directed to leave pursuant to subdivision (a), the person directing him or her to leave shall inform the person that if he or she reenters the campus or facility within seven days he or she will be guilty of a crime.  (2020 Cal Pen Code § 626.6)

4. Defendants Mays, Hogan, Becerra, Cruz, Steckler, McClain, Calvert, and DOES 1-20 are collectively referred to as "SDSUPD Defendants."

5. [FAC. ¶ 4.] This SAC describes that SDSUPD Defendants intentionally and maliciously misapplied PC 626.6 in a) knowing that Plaintiff had exhibited no conduct identifiable as "committing any act likely to interfere with the peaceful conduct of the activities of the campus or facility" (the "interference"), yet proceeding with reliance on knowingly untruthful police reports from a previous unprosecuted arrest; b) directing Plaintiff to "leave campus" two days after the alleged "interference" when in fact Plaintiff was then at his private residence far from campus; c) extending the prohibition "reenters the campus or facility within seven days" to nine days, and then, d)

requesting and then continuing support of a prosecution of Plaintiff for over two years.

6. This SAC describes that Defendant City of San Diego operated under reckless long-standing policies that led to the prosecution of Plaintiff without probable cause.

7. This SAC further describes that individual prosecutorial Defendants knew of the policy, believed themselves to be free from any of the safeguards that would flow from adherence to Cal. Penal Code § 740, and thus flouted their constitutional, professional, and ethical responsibilities in initiating and maintaining prosecution of Plaintiff without probable cause.

<u>EVENTS OF FEBRUARY 10, 2020</u>

8. [FAC ¶ 5.] On February 10, 2020, Plaintiff Robert L. Parker ("Plaintiff" or "Parker") was present on the campus of San Diego State University ("SDSU") ("campus") in San Diego, California. Parker's first purpose was to deliver papers in an envelope communicating to Taylor Leveron, Aztec Recreation Center (ARC) employee, that a) her personal information and Parker's personal information that should have been redacted from SDSUPD police reports (of an earlier incident involving both Parker and Leveron) had not been redacted, and b) that Parker was filing a records request with SDSUPD to determine who had received this personal information. Parker's second purpose was to file the records request.

9. [FAC. ¶ 6.]

During the period of Plaintiff's presence on campus on February 10, 2020, first, Plaintiff walked into the lobby of ARC, approached the front desk, said "dropping this off", set an envelope addressed to Taylor Leveron on the service counter, and walked out. The person behind the counter at the time, by

sheer coincidence, was Taylor Leveron. (Plaintiff video-recorded the short event.) Plaintiff was inside the lobby for nine (9) seconds. Second, Plaintiff walked across the street to the police station and delivered his records request at the reception window. Plaintiff then departed campus.

In Plaintiff's short period on campus on February 10, 2020, he exhibited no conduct from which a rational person could draw a conclusion that "it reasonably appears […] that the person is committing any act likely to interfere with the peaceful conduct of the activities of the campus or facility, or has entered the campus or facility for the purpose of committing any such act" (as excerpted from PC 626.6(a).)

10. [FAC ¶ 7.] PC 626.6 authorizes that under certain circumstances an authorized official "may direct the person to leave campus." On February 10, 2020, no person directed Plaintiff to leave campus. No person directed Plaintiff to do anything.

11. In the face of February 10, 2020 existence of any "act likely to interfere", any "[direction] to leave campus", or any statement prohibiting "[reentry upon] the campus or facility within seven days", there could be no criminal charge under PC 626.6. SDSUPD Defendants sought punishment of Parker for reasons stated herein. Their available legal option to restrain Parker from campus was in seeking a restraining order. SDSUPD Defendants knew that the state of facts would not support a restraining order. SDSUPD Defendants instead crafted a scheme to act contrary to law, take action against Parker anyway, and label that action with "PC 626.6."

12. The eventual unlawful arrest of Plaintiff on February 18, 2020 was the result of lapses of professionalism and integrity of SDSUPD member officers and their leadership, in combination with Plaintiff's open challenge to their professionalism, defiance of their perceived authority, and assertions of his fundamental civil rights.

13. These factors grew from an incident involving Plaintiff at ARC on March 4, 2019. The following sections detail events as applicable to each Defendant.

JONATHAN BECERRA

14. This narrative of events assigning blame to Defendant SDSUPD Detective Jonathan Becerra (Becerra) consists of three parts: First, events of March 4, 2019 at ARC; Second, Becerra's police report which led to a "No Issues" determination (declining to prosecute) from the City Attorney and Parker receiving the police report on November 4, 2019; and Third, Parker's misconduct report against Becerra filed on January 30, 2020.

15. On the evening of March 4, 2019 about 7:30 p.m., Defendant Jonathan Becerra ("Becerra") was on patrol on campus in his role as a SDSUPD police officer. Becerra was in his black-and-white patrol cruiser (probably a Ford Crown Victoria or similar model) on Aztec Walk, a street adjacent to Viejas Arena, which is itself adjacent to ARC. Becerra was hanging out with and providing cover for SDSUPD Sergeant Vince Dequito ("Dequito") because Sergeant Dequito was intoxicated; Becerra was protecting his superior officer Dequito and Becerra was aware that Dequito smelled of alcohol.

16. At about 7:35 p.m. Becerra and Dequito responded to a dispatched call for service to ARC, where it had been reported that two members (including Parker) were in an argument about a treadmill. Becerra and Dequito arrived in the police cruiser by way of Aztec Walk and a slow right turn onto 55th Street to the pickup/drop-off circle for Viejas Arena. Parker was outside ARC and saw Becerra and Dequito walk very slowly toward and then into the ARC lobby. They displayed no urgency. Becerra took the lead in discussion with an ARC staff member who reported that both members had already left. Dequito kept behind Becerra and at a distance.

17. Becerra was unaware that Parker had seen him arrive and enter the ARC lobby with Becerra. In a later deposition, Becerra testified of the service call, "I arrived on my own." In a later sworn declaration, Becerra carefully recounted the incident without mention of Dequito. Dequito's later sworn declaration also worked around the incident without admitting his own presence. These omissions evidence a desire by both men to avoid reporting of Dequito's presence with Becerra.

18. At about 8:02 p.m., Becerra and Dequito responded again to a call from ARC. Again they arrived together via Aztec Walk in the police cruiser.

19. Becerra and Dequito arrived to see SDSUPD officer Carrie Hogan in contact with Parker. Becerra stopped 5 feet short of Parker. Dequito stood behind and to the side of Becerra, another 5 feet away from Parker. Hogan said "he's refusing to talk to me" and departed to interview Taylor Leveron. Parker said to Becerra and Dequito "I've asserted my Fifth Amendment rights."  Dequito asked in a puzzled tone "Fifth Amendment?". Becerra said "ok, you can remain silent". Dequito said "If you're not gonna tell us we're not gonna know. All right? If you're gonna play this Fifth Amendment game, we're not gonna know." Parker asked Dequito "it's a game?" and Dequito said with a sneer, "If you're not gonna cooperate with us, then it's gonna be a bigger problem." In deposition later, Dequito admitted that he meant that Parker would be under arrest, and that "cooperate" meant providing identification.

20. Throughout the detention, Becerra and Dequito frequently cross-talked each other and cross-talked Parker. Becerra and Dequito together executed a short-attention-span theater performance of rapid cross-talking with arrogant, aggressive, and accusing tones. Parker felt like he was trying to defend himself and focus on a conversation with two guys who kept reaching up and poking each other in the eye, then blaming Parker for it.

21. Becerra asked for Parker's name. Parker stated "I'm not going to tell you a name unless you state to me that I'm required to give you my name." Becerra again asked for Parker's name. Parker asked "Am I required to give you my name?" Dequito said "If you don't, it's going to be 148". Parker asked "say that again?" and Dequito said "You're gonna get charged with 148, delaying and obstructing". Parker asked again "Am I required to give you my name?" Becerra answered "148 of the penal code" and Dequito said "You'll be under arrest". (It is clearly established that an arrest under Cal. Penal Code 148 for failure to identify is a violation of the Fourth Amendment. *Martinelli v. Beaumont*, 820 F.2d 1491 (9th Cir. 1987) A threat of arrest for exercising a constitutional right is a violation of Cal. Civil Code Section 52.1, the Bane Act.)

22. Becerra and Dequito had both made it clear: If Parker did not give his name, he would be arrested. Parker immediately responded to this threat of arrest by giving his name, stating clearly "My name is Robert Parker. I am a member here." Becerra was standing in front of Parker with his pad and pen/pencil. Becerra wrote "Robert" on his pad. Becerra's short attention span took over as Becerra looked up and confronted Parker about his lack of cooperation.

23. Becerra had initially stopped five feet short of Parker. Two minutes later, Becerra had taken three steps closer and was now exactly toe-to-toe with Parker, with Parker backed against the service counter. Becerra pointed his finger at Parker in several jabbing motions.

24. SDSUPD Officer David Lamaku arrived. Lamaku stood well back from Parker. Dequito stood well away from Parker and Lamaku.

25. Becerra asked Parker for his name again. Dequito said "Did he not give you his name?" Becerra said "Nope." Dequito said "Arrest him." This was the second time Parker had been clearly threatened with arrest if he didn't give his name. Parker gave his last name again, spelling it out.

26. Dequito said "One more time, dude" and "Just one more time and you're under arrest." Becerra said "You do understand that they can revoke your membership?" Parker said "say it again". Dequito said "One more time and you're under arrest". Becerra reminded Parker they can revoke Parker's gym membership.

27. For the entirety of Parker's four-minute pre-arrest contact with Becerra and Dequito, they asked Parker zero investigative questions. The entirety of their focus was on getting Parker's identification.

28. Hogan returned after four minutes, stood by Dequito's side, and reported "I don't have a victim."

29. Parker spelled out his last name again, very slowly, with exaggerated pronunciation. Parker was being very deliberate to avoid a further accusation that he wasn't cooperating.

30. Becerra asked for Parker's birthdate.  Parker asked  "Am I required to provide my birthdate?" It seems Parker's statement was the "one more time, dude" Dequito was talking about. Becerra said "that's it, we're done", Dequito said "arrest him", and Becerra told Parker to turn around. Hogan and Becerra handcuffed Parker while Dequito, smelling of alcohol, stood at a distance.

31. Parker was focused on the arrest and repeatedly asserted his right to remain silent and said "I want an attorney". Regarding his property in the locker room, Becerra said to the staff "Just cut the lock and toss it, he doesn't want his stuff", and Dequito said "You can't come back today to get your shit."

32. Becerra walked Parker outside, followed by Hogan. Dequito lagged behind. Lamaku approached Dequito and explained that they couldn't arrest primarily for obstruction; that "they wouldn't take it" (meaning the City Attorney would not prosecute it) unless there was a primary charge and PC 148 was the secondary charge.

33. Despite Parker's clear assertion of Miranda rights, Dequito continued to interrogate Parker aggressively after the arrest. Dequito yelled "Explain it to us then, we've been asking you" and "We're all the way out here, handcuffed and into the car!".  Parker asked "Can I turn around?" and Dequito yelled "NO! Tell us!"

34. In response to Dequito's rant, Hogan spoke lowly to Becerra: "I think he's been drinking", referring to Dequito. Becerra did not respond and walked away.

35. Becerra departed and returned inside ARC. In his police report dated 03/04/2019, Becerra wrote "… I spoke with the reporting party and staff lead at the ARC, Taylor Leveron. Leveron essentially told me Parker and the second male adult were in a physical altercation over a treadmill inside the ARC early at about 1932 hours (Incident #1903040096). Officers had arrived at that incident, but both parties at [sic] already departed the gym. Leveron stated she did not learn of the physical portion of the altercation until after the incident had already occurred as she spoke with the second male adult who had told Leveron he was struck by Parker. The adult male refused medics or to file a police report and left the gym. Leveron told me Parker walked back into the gym and Leveron attempted to speak with Parker, but Parker refused and told Leveron if she wanted to speak they can go outside. Leveron took this as a threat as Leveron was intimidated by Parkers taller stature and in knowing he had just allegedly struck another gym patron, Leveron said she was scared and activated the panic button. I concluded my interview with Leveron […] "

36. In later deposition, Becerra contradicted his own police report and denied that he did any investigation when he reentered ARC. In short, Becerra testified that the reported conversation with Leveron didn't even exist.

37. When Becerra returned to the other officers, Parker heard Becerra say "there was no fight" indicating that in fact, Becerra had been inside investigating. Becerra was right: There was no fight.

38. Becerra wrote in his police report that he detected the "slight odor of alcohol" during the investigation inside the gym before Parker was arrested. In deposition, Becerra shifted the time and location of alcohol smell to be post-arrest, outside of the gym, and he admitted that Dequito was with him when he smelled alcohol.

39. About 30 minutes after Parker's arrest, in response to Parker's show of disrespect for Dequito, Dequito suggested "this dude, he's like drunk", referring to Parker. Hogan reacted to Dequito's prompt and said that she smelled it. Hogan knew, in fact, that it was Dequito who smelled of alcohol. After Parker was released, Hogan went back inside ARC and told Leveron that Parker was intoxicated.

40. Throughout the incident, Dequito displayed a lack of professionalism and an angry, bullying, impatient and frustrated demeanor. Dequito's behavior and language were inconsistent with both his profession and adulthood itself, but fully consistent with intoxication. Dequito was intoxicated and both Becerra and Hogan detected the smell of alcohol emanating from Dequito. Both Becerra and Hogan adopted Dequito's "he's like drunk" accusation against Parker and wrote in their police reports that Parker smelled of alcohol. As stated earlier, Becerra later admitted that what he wrote in his police report was wrong and that when he smelled alcohol, Dequito was present. In deposition later, Hogan testified that odor was the only clue she had to support an accusation of alcohol usage by Parker.

41. In October 2019, the San Diego City Attorney made a finding of "No Issues" on police reports related to 03/04/2019 incident, declining to prosecute. This enabled Parker to request police reports from the SDSUPD Records Office on

November 4, 2019. Parker picked up what was produced by the Records Office on November 6, 2019: Police reports of Hogan and Becerra, both having been approved by senior officer Dequito. Parker learned later that the reports of Detective (Defendant) Steckler and Detective Svec were withheld.

42. Parker reviewed Becerra's report and found that it was full of lies that could certainly have been exposed by simple review of Becerra's body-worn camera (BWC) video. Becerra's report stated "I **have** body worn camera of this incident." (Bold in original.)

43. On January 30, 2020 Parker filed a misconduct complaint against Becerra by way of email titled "Parker IA complaint #3, re: Becerra" to Josh Mays, then Chief of Police, SDSUPD. In that complaint, Parker detailed 17 instances of dishonesty in Becerra's report, with repeated references to the fact that this dishonesty would be revealed by review of Becerra's BWC video. According to SDSUPD in response to Parker's request for documents in a different case, Becerra's BWC video does not exist.

44. Among these 17 instances, Parker accused Becerra of fabricating Leveron's account of her encounter with Parker. In reality, Leveron pursued Parker and wanted to have a fact-finding discussion with Parker, while Parker evaded Leveron and didn't want to speak with her at all. In Becerra's incredible fabrication of Leveron's account, Parker challenged Leveron to fight.

45. After Leveron was misinformed that Parker was intoxicated and with time to craft a false memory of the incident, Leveron falsely claimed to her manager that "[Parker] got in my face in the hallway." Tellingly, amongst an abundance of security video from seven (7) cameras providing full coverage of the ARC space, the Hallway video from the suggested time period no longer exists.

46. The history stated here reveals that Jonathan Becerra had been immensely frustrated by an imperfectly cooperative suspect in Parker who asserted his right to remain silent and lawfully withheld identification until threatened with

arrest; that Jonathan Becerra had been concealing the intoxication of his senior officer Vince Dequito and then followed Dequito's commands to arrest Parker; that Jonathan Becerra filled a police report with lies in an effort to justify an unlawful arrest; and that Jonathan Becerra was facing a misconduct complaint that would be easily proven out by his own BWC video. Becerra was aware of all of these facts.

47. The allegations in this JONATHAN BECERRA section describe the conduct and state of mind of Defendant Jonathan Becerra who became aware in February 2020 that his untruthful police report was being used by SDSUPD to establish and maintain a prosecution of Plaintiff without probable cause. Becerra knew that his untruthful document was being used to harm Parker, and he did nothing to correct the injustice that his writings supported. Instead, SDSUPD and Becerra buried the BWC video supporting Parker's allegations here.

<u>CARRIE HOGAN</u>

48. This narrative of events assigning blame to Defendant SDSUPD Officer Carrie Hogan consists of three parts: First, events of March 4, 2019 at ARC; Second, Hogan's police report which led to a "No Issues" determination (declining to prosecute) from the City Attorney and Parker receiving the police report on November 4, 2019; and Third, Parker's misconduct report against Hogan filed on January 29, 2020.

49. On the evening of March 4, 2019 about 8:00 p.m., Parker was inside the Aztec Recreation Center (ARC) at SDSU, walking slowly toward the front lobby. Parker saw a police officer (later identified as Hogan) and continued toward the lobby and exit, with a slow, calm and peaceful outward display.   Parker started the audio recorder on his phone.

50. Hogan and Parker had a short interaction. Hogan insisted that Parker must answer her questions and Parker insisted that he had the right to remain silent.

1  This standoff lasted two minutes until officers Becerra and Dequito arrived at

2  8:02 p.m.

3  51. Hogan departed to speak with Taylor Leveron and returned to Parker, Becerra,

4  Dequito, and Lamaku four minutes later, as described in the "Jonathan

5  Becerra" section herein.

6  52. Hogan stood by Dequito's side and said "I don't have a victim." Hogan

7  lowered her shoulders and arms in a gesture of disappointment that she was

8  not going to get to arrest Parker. A few seconds later, Dequito acted out in

9  frustration and told Becerra to arrest Parker.

10  53. A few minutes after the arrest and outside of ARC, Hogan witnessed

11  Dequito's tirade toward Parker. Hogan spoke lowly to Becerra: "I think he's

12  been drinking", referring to Dequito. Becerra did not respond and walked

13  away.

14  54. Dequito and Hogan had a conversation about 8 minutes after the arrest in

15  which they attempted to pry Parker's lack of cooperation into a box of

16  criminal conduct:

17

18  (Starting at 8:15:04 p.m. on Hogan BWC, Dequito BWC, and Parker's phone voice recorder.)

19  **Hogan**: Hey Sarge, Sarge.

20  **Hogan**: Do you wanna do the, the one fight - one is fight or is challenge to a fight, but I don't have the victim. Do you wanna do the offensive words one?

21  …or the

22  **Dequito**: It's disturbing um the peace

23  **Hogan**: well there's three sections. Fight or challenge to fight in a public place, noise, or offensive words likely to provoke a violent reaction in a public place …

24

25  **Hogan**: there's a community college … oh, this is a good one. 415.5(a) commit acts enumerated within [Hogan and Dequito turn of BWC at 8:15:44 p.m.] a building or grounds of any school or community college, state college or state university, so that works.

26

27

28  **Dequito**: What's that footnote on it?

**Hogan**: Um….
**Dequito**: Refuse to disperse
**Hogan**: No, that's that's a different - so this this would be the only one
**Hogan**: So this, the disturb the peace on school grounds, I mean he challenged someone to fight but that I don't have a victim
**Hogan**:… so I would do offensive words likely to provoke .. I mean we I don't - I don't know if this really works because we can't be the victim
**Dequito**: No we're not the victim well did he challenge one of the people at the desk to fight?
No, it was another patron that left
**Dequito**: We could do 148, just 148 we detained him to investigate and he would not
**Hogan**:  no 415? ok.
**Dequito**: yeah he wouldn't give us his name.

55. On 03/04/2019 Hogan wrote her police report recommending prosecution "for 148(A)(1)PC-Obstruct a Public Officer."

56. Hogan's report, like Becerra's, was full of lies.

57. On January 29, 2020 Parker filed a misconduct complaint against Hogan by way of email to Josh Mays. In that complaint, Parker detailed 22 instances of dishonesty in Hogan's report. After reviewing Hogan's BWC video, Parker identified further dishonesty.

58. Hogan described Parker as standing with "hands in clenched fists at his sides" and her BWC shows that this is untrue. Hogan described Parker as taking aggressive steps toward Hogan and "leaning over" Hogan; BWC shows that these are untrue.  Hogan describes that "Parker was taking a fighting stance with me"; BWC shows that this is untrue.

59. Hogan described that Leveron "felt intimidated" by Parker refusing to talk to her and asking her to "go outside" and "Parker became agitated with her verbally"; BWC shows that Hogan's report of Leveron's account is untrue.

60. Hogan claims in her police report

"I recontacted Parker who was still speaking with Sergeant Dequito and Detective Becerra. While I was talking with Leveron, Parker was yelling at the two officers the entire time and refused to give them his name. I again advised Parker that I was conducting an investigation and that I need to ask him some questions to clarify what had occurred. I also asked him if he was injured or if the other party was injured in any way. Parker again refused to answer any questions and continued to yell at all three of us. By this time I had been attempting to investigate for approximately 20 minutes."

61. There is not a single sentence in that paragraph that is true. Each of the six sentences is a fabrication. The paragraph itself states a period in time that doesn't exist: Hogan never recontacted Parker at all before the arrest.

62. Hogan described "I noticed a strong smell of alcohol coming form [sic] Parker's breath and person. Hogan knew that this was untrue and knew that, in fact, the smell of alcohol was coming from Vince Dequito.

63. The history stated here, in conjunction with allegations stated in the Jonathan Becerra section, reveal that Carrie Hogan came to the conclusion that Parker would not be arrested and that upset her; that Carrie Hogan was frustrated by Parker's "failure to cooperate"; that Carrie Hogan knew that Vince Dequito had been drinking and smelled of alcohol, yet she followed the Sergeant's accusation of "this dude, he's like drunk" and falsely reported that Parker smelled of alcohol; that Carrie Hogan filled a police report with lies in an effort to justify an unlawful arrest; and that Carrie Hogan was facing a misconduct complaint that could be easily proven out by her own BWC video. Hogan was aware of all of these facts.

64. The allegations in this CARRIE HOGAN section describe the conduct and state of mind of Defendant Carrie Hogan who became aware in February 2020 that her untruthful police report was being used by SDSUPD to establish and maintain a prosecution of Plaintiff without probable cause. Hogan knew that

her untruthful document was being used to harm Parker, and she did nothing to correct the injustice that her writings supported.

## VINCE DEQUITO and MISCONDUCT COMPLAINTS

65. On February 16, 2020 Parker filed a misconduct complaint against Vince Dequito, sending the complaint by email to Josh Mays. Included in the complaint was "Dequito signed and approved the reports of Hogan and Becerra, knowing from his own personal attendance of the real events that the reports of Hogan and Becerra contained multiple fabrications that were inconsistent with reality."

66. Josh Mays acknowledged receipt, stating that "These allegations are included in the scope of the outside investigator's investigation.  That is still ongoing. You will be informed of the outcome once it is completed." On May 15, 2020 Mays reported to Parker "the investigation disposition is unfounded. Unfounded means the investigation conclusively proved that the act(s) complained about did not occur."

67. In a later deposition, Dequito testified that he terminated employment at SDSUPD and that he was never investigated under any misconduct complaint.

68. Parker has no knowledge that Dequito was aware at any time that the untruthful police reports he approved were being used to support a malicious prosecution of Parker.

69. Through Parker's misconduct complaints exposing multiple untruths within police reports, Mays knew that the police reports were untruthful and unreliable as a foundation for any future action against Parker.

TRACI STECKLER, NORMA CRUZ, ANTHONY CALVERT

70. Defendant Detective Traci Steckler investigated the March 4, 2019 incident and wrote a report. In that report, she wrote that she reviewed the ARC security video. Steckler also wrote "Leveron and Parker went into the hallway where Parker yelled at her." The statement is not true. Steckler knew that this was not true, because at the time in question, Leveron was following Parker toward the hallway and Leveron was yelling at Parker. Steckler provides a detailed review of the Hallway video yet fails to report observation of Parker yelling at Leveron.

71. Steckler wrote "[Leveron] asked to speak with Parker again. Parker told Leveron "let's deal with this outside" and he would "only handle this outside." Leveron explained she did not feel comfortable stepping outside with Parker. Leveron told Parker she was only trying to help him." Leveron's sentiments "she did not feel comfortable" and "she was only trying to help him" are a far cry from the accounts of Becerra (now disclaimed), "Leveron took this as a threat", "Leveron was intimidated"; and Hogan (who references Becerra's account), "Parker had become agitated with her verbally", "Leveron felt intimidated".

72. Steckler knew that the reports of Hogan and Becerra were untruthful. Defendant Norma Cruz was Steckler's senior officer, and Cruz approved Steckler's police report. Cruz knew that the reports of Hogan and Becerra were untruthful, that Steckler's report of events conflicted with the security video, and that Steckler's report of Parker's encounter with Leveron was far less confrontational than reported by Hogan and Becerra.

73. On January 27, 2020, Parker spoke to Cruz and Steckler by telephone. Prior to the call, Parker sent an email with a document detailing the many untruthful items in the Hogan and Becerra reports that were approved by Dequito. Steckler agreed that she would review the document. Cruz ordered Steckler not to review the document. During the conversation, Cruz repeatedly

interrupted Parker when he began to inform Cruz and Steckler of the problems with the police reports. Cruz stated that those historical police reports would reflect the truth of the matter and that they would form the basis of the department's understanding of the incident.

74. [FAC ¶ 11.] On February 12, 2020, Steckler and Anthony Calvert ("Calvert") arrived at the private residence of Plaintiff and delivered a notice purporting to be supported by PC 626.6. The notice was established based on Plaintiff's presence on campus on February 10, 2020. Along with Steckler and Calvert, Josh Mays, Norma Cruz, and Paul McClain all knew that the delayed off-campus notice was not supported by law.

75. Also on February 12, 2020, Parker emailed Josh Mays objecting to the unlawful advisal and stating "I will defy your unlawful order." Mays shared Parker's message with all SDSUPD Defendants and communicated to all SDSUPD Defendants that Parker was to be arrested if he came to campus. Mays' directive was retaliatory and malicious; Mays knew that Parker was correct in his assessment that the notice was not supported by law. Mays was worn by Parker's relentless communication of the misconduct of his officers. Mays' communication to arrest Parker was a decision to rely upon the untruthful and unreliable words of Hogan, Becerra, and Steckler; Mays' communication was a step toward initiation of prosecution of Parker without probable cause.

76. [FAC ¶ 12.] On February 18, 2020, eight (8) days after Plaintiff's relevant previous presence on campus, Plaintiff made himself present on campus and was arrested, booked, and jailed for violation of PC 626.6. Cruz assisted in the arrest and expressed disdain for Parker because Parker had defied Mays. Cruz also expressed "and now you're in handcuffs" as a statement that the arrest itself was proof that Parker was worthy of derision.

PAUL MCCLAIN

77. Defendant Paul McClain took the action that brings into relevance the preceding buildup of history of untruthful and unreliable police reports from a 03/04/2019 incident:

78. Paul McClain and Norma Cruz made the arrest of Parker on 02/18/2019 and McClain wrote the 02/19/2020 police report seeking prosecution of Parker under PC 626.6. In writing the report, McClain knew that Parker's 02/10/2020 conduct alone did not amount to an "act likely to interfere."

79. McClain opened with the perplexing statement

> "On 02/10/2020, at approximately 1259 hours, PARKER entered the Aztec Recreation Center (ARC) after being advised not to return pursuant to 626.6(A) PC."

McClain provided no facts supporting the existence of any PC 626.6(a) advisal applicable to Parker on 02/10/2020; in fact, none existed. The allegation is a phantom conclusory statement without support.

80. McClain next described Parker's conduct by "Parker gave Leveron […] a letter causing Leveron to be scared." McClain provided no facts that would lead a reasonable reader reviewing the statement to find that the statement supported probable cause for any criminal charge.

81. Instead of proceeding with supporting facts, McClain concluded with "LEVERON was involved in the original incident on 03/04/2019 related to police report 19-269" and "Based on PARKER's previous incident at the ARC involving LEVERON, and PARKER returning to the ARC without permission, PARKER is committing an act that is interfering with the peaceful conduct of the ARC facility on SDSU Campus."

82. The "returning to the ARC without permission" phrase was addressed above: No supportive facts were offered.

83. The rest of the statement is nothing more than an invitation to "go see for yourself" by reading historical police reports, followed by a conclusory statement of "an act that is interfering."

84. McClain's report does not form a basis for a conclusion that Parker committed "an act likely to interfere". The report merely invites the reader to explore the earlier police reports for the source of Leveron's fear (if such even existed) and the causal link between delivery of an envelope and that fear. That exploration is only supported by reference to police reports known to be unreliable by all SDSUPD Defendants.

85. Finally, McClain's police report seeking prosecution of Parker was approved by Norma Cruz. Cruz was aware that the reference to untruthful and unreliable historical police reports was a deception directed to a prosecutor, and a malicious design towards initiating and maintaining prosecution of Parker without probable cause that a crime had been committed.

FIRST CAUSE OF ACTION

MALICIOUS PROSECUTION AGAINST SDSUPD DEFENDANTS

[Civil Rights Action (42 U.S.C. § 1983) For Malicious Prosecution]

[Against Defendants Mays, Becerra, Hogan, Cruz, McClain, Steckler, Calvert; and DOES 1-20; collectively "SDSUPD Defendants".]

86. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

87. [FAC ¶ 9.] PC 626.6 states a prohibition of the person's reentry upon campus within seven days after the person has been directed to leave campus. On February 10, 2020, Plaintiff was not directed to leave campus. All SDSUPD Defendants knew that this was the only applicability of PC 626.6 and that without it, any action taken against Plaintiff would be without probable cause.

Despite this knowledge, All SDSUPD Defendants undertook steps toward initiating prosecution of Plaintiff without probable cause.

88. [FAC ¶ 10.] PC 626.6 does not authorize police officers to wait two days after the person's presence on campus, arrive at the person's private residence that is not on campus, and direct the person to leave campus and not return for seven days. Nonetheless, that is what Defendants Steckler, McClain, Cruz, Mays and DOES 1-20 did in this case. In doing so, they took a step toward initiating prosecution of Plaintiff without probable cause.

89. [FAC ¶ 13.] Defendants Josh Mays, Norma Cruz, and DOES 1-20 directed the "knowingly, wantonly, maliciously, recklessly and intentionally unlawful PC 626.6 notice" (henceforth "notice") to Plaintiff on February 12, 2020.

90. [FAC ¶ 14.] Defendants Traci Steckler and Anthony Calvert knowingly, wantonly, maliciously, recklessly and intentionally misapplied the law in delivering the notice to Plaintiff on February 12, 2020. Each instance was a step toward initiation of prosecution of Plaintiff without probable cause.

91. [FAC ¶ 15.] Defendants Josh Mays, Paul McClain, Norma Cruz, and DOES 1-20 directed the "knowingly, wantonly, maliciously, recklessly and intentionally unlawful arrest" ("arrest") of Plaintiff on February 18, 2020. Each instance was a step toward initiation of prosecution of Plaintiff without probable cause.

92. [FAC ¶ 16.] Defendants SDSUPD officers Norma Cruz, Paul McClain, and DOES 1-20 knowingly, wantonly, maliciously, recklessly and intentionally implemented the arrest of Plaintiff without probable cause on February 18, 2020. This was a step toward initiation of prosecution without probable cause.

93. [FAC ¶ 17.] Defendants Mays, Hogan, Becerra, Steckler, Cruz, McClain, and DOES 1-20 [Calvert is not included] knew that evidence provided – by themselves or other SDSUPD members – to the City Attorney was fabricated and false, and that the untruthful evidence would be used to harm Plaintiff by

causing initiation of a criminal charge without probable cause, yet they continued in their support of the truth of that evidence throughout the period of prosecution.

94. In all instances, these Defendants undertook this conduct knowingly, wantonly, maliciously, recklessly, and intentionally with the goal of harming Plaintiff through the initiation of prosecution without probable cause.

95. The conduct of all Defendants named in this First Cause of Action advanced, maintained, and prolonged the prosecution of Plaintiff under a charged crime without probable cause, in violation of Plaintiff's constitutional rights of due process under the Fourth Amendment and Fourteenth Amendment of the U.S. Constitution.

## SECOND CAUSE OF ACTION
## [INJUNCTIVE RELIEF]

96. Plaintiff abandons his request for injunctive relief in order to focus on primary claims.

## PROSECUTORIAL TIMELINE

97. [FAC ¶ 18.] On June 19, 2020, prosecution of Plaintiff was initiated as case M267387 with the single charge of violation of Cal. Penal Code 626.6(a). The criminal complaint was unsigned.

98. [FAC ¶ 22.] The date for arraignment was originally set for November 10, 2020. The date was rescheduled to December 3, 2020. On that date the hearing was held in Dept. 2202, Judge Jay M. Bloom presiding. Parker was unsuccessful in his attempt to appear remotely.

99. [FAC ¶ 23.] Next, Parker submitted an affidavit explaining his failed attempt to attend the arraignment hearing. An *ex parte* hearing was held on March 4, 2021 in Dept. 1301, Judge Robert O'Neill presiding. During that hearing, still

with no signed criminal complaint, arraignment was scheduled for July 12, 2021.

100.    [FAC ¶ 24.]On July 12, 2021 in Dept. 201, Judge Rachel Cano presiding, Parker was arraigned and a plea of Not Guilty was entered. Still with no signature on the criminal complaint, the court noted "Court finds good cause to continue."

101.    [FAC ¶ 25.]On December 9, 2021 in Dept. 202, Judge Polly H. Shamoon presiding, the court set dates of January 27, 2022 for Readiness and March 17, 2022 for trial.

102.    [FAC ¶ 26.]On January 27, 2022 in Dept. 202, Judge Theodore M. Weathers presiding, the court held "An unreported chambers conference." The prosecutor unsuccessfully tried to persuade the court to issue a restraining order prohibiting Parker from entering the SDSU campus, despite there being no affidavit supporting the request. The court expressed concern that the criminal complaint had never been signed by any prosecutor. Defendant's attorney and the court expressed concern that defendant Parker had been provided no discovery. The court set a date of February 16, 2022 for a Readiness hearing.

103.    [FAC ¶ 27.]To be clear, Parker does not seek damages for the prosecutor's attempt to obtain a restraining order. The allegation simply demonstrates that the prosecution's goal was aligned with and similar in process to that of SDSUPD, who sought to achieve punishment of Parker through unsworn, untruthful statements (police reports) where sworn statements were necessary.

104.    [FAC ¶ 28.]On February 16, 2022, in Dept. 202, Judge David L. Berry presiding, the trial date of March 17, 2022 was confirmed. Still no prosecutor had taken the prosecutorial actions of reviewing the evidence provided by SDSUPD toward making a determination that the evidence supported probable

cause to charge Parker with a crime, and applying a signature under penalty of perjury to the criminal complaint.

105.    [FAC ¶ 29.] On March 17, 2022, in Dept. 201, Judge Anthony Campagna presiding, Parker appeared for trial and the court granted the prosecutor's request to dismiss the charge.

## THIRD CAUSE OF ACTION
## MALICIOUS PROSECUTION, A MONELL CLAIM
## AGAINST THE CITY OF SAN DIEGO
[Civil Rights Action (42 U.S.C. § 1983) For Malicious Prosecution]
[Against Defendant City of San Diego]

106.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

107.    Plaintiff has alleged at ¶¶ 8-9 and ¶¶ 89-94 that Plaintiff's conduct and McClain's report of that conduct cannot combine to a reasonable conclusion the Plaintiff could be charged with violation of PC 626.6(a). There is no combination of circumstances and facts available to the City of San Diego or any person with which to justify a criminal charge against Plaintiff.

108.    [FAC ¶ 18.] On June 19, 2020, acting on a police report from Defendant Paul McClain of SDSUPD, somebody initiated prosecution of Plaintiff by delivering to the court an unsigned misdemeanor criminal complaint. This initiated case M267387 with the single charge of violation of Cal. Penal Code 626.6(a).  The prosecution against Plaintiff was maintained until it was dismissed on the day of trial, March 17, 2022.

109.    The complaint against Plaintiff was stated as follows:

On or about February 18, 2020, ROBERT LEWIS PARKER, not being a student, officer or employee of a college or university, to wit: SAN DIEGO STATE UNIVERSITY, and who was not required by his employment to be on the campus and other facility owned, operated, and controlled by the governing board of that college and university, did enter the campus and facility, and, after being directed to leave the campus and facility by a person designated to maintain order on the campus and facility after it reasonably appeared that the defendant was committing an act likely to interfere with the peaceful conduct of the activities of the campus and facility, and had entered the campus and facility for the purpose of committing any such act, unlawfully willfully and knowingly reentered upon the campus and facility within seven days after being directed to leave, in violation of PENAL CODE SECTION 626.6(a).

110.    Other than the simple "to wit: [SDSU]" phrase, the misdemeanor complaint is almost a verbatim recitation of the statute, with the exception that each instance of "campus or facility" in the statute has been changed to "campus *and* facility." This is strong evidence of incompetence in the preparation of the complaint. No competent person would accept that changing or's to and's leaves the interpretation of the statute intact.

111.    The complaint's near-recitation of a statute does not state directly or facilitate a conclusion that there was probable cause to charge Plaintiff.

112.    The misdemeanor complaint does not meet the standard required of a criminal charge under the Sixth Amendment and Fourteenth Amendment: "[T]he [charging document] must provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense. [Citations.]"*Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007)

113.    The misdemeanor complaint does not have a signature where the statements preceding the "Complainant" signature line read "The undersigned, certifying up information and belief, complains that in the County of San Diego, State of California, the Defendant(s) did commit the following

1   crime(s)" and "I declare under penalty of perjury that the foregoing is true and

2   correct and that this complaint, case number M267387, consists of 1 count."

3   114. Cal. Penal Code § 740 states "Except as otherwise provided by law, all

4   misdemeanors and infractions must be prosecuted by written complaint

5   under oath subscribed by the complainant. Such complaint may be verified

6   on information and belief."

7   115. Plaintiff alleges that at the time of initiation of prosecution against Plaintiff,

8   the City of San Diego had two long-standing policies in the filing of

9   misdemeanor complaints: A) The City had a long-standing policy of

10  allowing misdemeanor complaints to be filed with no description of the

11  charged criminal conduct particularized to the individual, but rather only a

12  recitation of the statute charged. B) The City had a long-standing policy of

13  allowing misdemeanor complaints to be filed without compliance with Cal.

14  Penal Code § 740.

15  116. Between about August 15, 2024 and August 22, 2024 Plaintiff went to the

16  Records Office at San Diego Superior Court twice and examined twelve (12)

17  misdemeanor criminal case files ranging in case number and filing date from

18  M258000, 04/23/2019 to M267382, 03/18/2020. In nine of the twelve cases,

19  the misdemeanor criminal charge was nothing more than a recitation of a

20  statute. In three of the cases, the only departures from recitations of statutes

21  were "to wit: 88mph", "to wit: alprazolam", and "to wit: heroin". Based on

22  these observations, Plaintiff alleges the City had a long-standing policy of

23  allowing the filing of misdemeanor charges by recitation of a statute.

24  117. Policy B: In all twelve of the cases inspected by Plaintiff, at the

25  Complainant line as described above, there was a squiggle of ink

26  unrecognizable as a signature, and no printed name.

27  118. Policy B: On four occasions between July 2024 and August 2024 inclusive,

28  while being served at the same Records Office, Plaintiff has asked the clerk

1   if they have ever seen a name at the Complainant line of a misdemeanor

2   complaint. On each occasion, the clerk has answered "No."

3   119. Policy B: On July 1, 2024 Plaintiff went to the Office of the City Attorney

4   with a real example page from a March 2019 misdemeanor complaint.

5   Plaintiff asked the receptionist/clerk what he needed to do to find the identity

6   of the signatory. Plaintiff was met with a shocked look and a response of

7   "We don't give out the name. It's to protect our prosecutors." Plaintiff then

8   spoke with Tess Galante, Lead Clerk. Ms. Galante verified that the policy of

9   the Office of the City Attorney was to protect the identity of the

10   Complainant.

11   120. While the Policies A and B might have served practical purposes, and they

12   might have served justice in the cases in which a reviewing attorney was

13   faithful to the certification and oath under penalty of perjury, the policies

14   were reckless and deliberately indifferent to the rights of defendants to be

15   charged upon probable cause and nothing short of probable cause.

16   121. Policy A is deliberately indifferent to underlying Sixth Amendment and

17   Fourteenth Amendment rights of fair notice and due process, and

18   deliberately indifferent to the Fourth Amendment rights of defendants to be

19   charged only upon probable cause. Policy A allows prosecutors to skip the

20   exercise of constructing charges particularized to the individual; it is this

21   skipped exercise that would have led prosecutors to identify that there was

22   no probable cause to charge Plaintiff with a crime.

23   122. Policy B is deliberately indifferent to Cal. Penal Code § 740, which provides

24   the safeguards necessary when prosecutors have immunity from any action

25   seeking to hold them liable for mistakes of prosecutorial discretion.

26   Safeguards. The principle of Absolute Immunity has been justified by the

27   existence of "safeguards" that otherwise support the constitutional rights of

28   citizens. In the traditional model of prosecution, an individual DCA would

attach their name to every initiated prosecution during their tenure. Any watchdog, whether it be a judge, an observant colleague, a defense attorney, a state bar association, an employer, a political supporter or opponent, or any private citizen would then be able to monitor the specific and cumulative conduct of that DCA.

123. The City's Policy B lets prosecutors know they are not subject to safeguards. This gives prosecutors a free pass to skip past a determination of probable cause.

124. If the City needs protection for its prosecutors, it must seek that protection through the legislature. The City has instead taken a reckless and cavalier approach in establishing a policy of ignoring § 740 altogether. This policy of allowing unsigned misdemeanor criminal complaints means that each prosecutor knows they can slip some unworthy (no probable cause) actions through the system with no risk of consequences. The City's Policy B allowing unsigned complaints is thus deliberately indifferent to defendants' Fourth Amendment right to be charged only upon probable cause.

125. In this case, the City's Policy B allowed some unidentified person(s) to initiate criminal proceedings against Plaintiff without probable cause and without safeguards and consequences.

126. The conduct of Defendant named in this Second Cause of Action advanced, maintained, and prolonged the prosecution of Plaintiff under a charged crime without probable cause, in violation of Plaintiff's constitutional rights of due process under the Fourth Amendment and Fourteenth Amendment of the U.S. Constitution.

FOURTH CAUSE OF ACTION

MALICIOUS PROSECUTION

AGAINST "PROSECUTORIAL DEFENDANTS"

[Civil Rights Action (42 U.S.C. § 1983) For Malicious Prosecution]

[Against DOES 21-50]

127. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

128. Plaintiff has isolated the individual claims against the SDSUPD Defendants in the First Cause of Action and added this Fourth Cause of Action to isolate the claims against DOES 21-50, the "Prosecutorial Defendants".

129.  Plaintiff has alleged at ¶¶ 8-9 and ¶¶ 89-94 that Plaintiff's conduct and McClain's report of that conduct cannot combine to a reasonable conclusion the Plaintiff could be charged with violation of PC 626.6(a). There is no combination of circumstances and facts available to the City of San Diego or to any person with which to justify a criminal charge against Plaintiff.

130.  Throughout the course of the prosecution, there were no amendments to the charges and no evidence was produced to Plaintiff that could possibly support a finding of probable cause for a charge of violation of PC 626.6(a).

131. Plaintiff alleges that DOES 21-50 initiated the prosecution and maintained the prosecution against Plaintiff until March 17, 2022. Plaintiff alleges that in initiating and maintaining (failing to terminate) the prosecution, neither the municipality nor the individuals exhibited prosecutorial action "intimately associated with the judicial phase of the criminal process" or "[in the exercise of] the independence of judgment required by [their] public trust", because the prosecution was initiated contrary to law (Cal Pen Code § 740) requiring that some prosecutorial professional attach their signature (and hence, place their personal stake in their professional reputation, honor, dignity, ethical conduct, and public trust) on the criminal complaint.

132.  [FAC ¶ 20.]Throughout the entirety of the prosecution against Parker, no prosecutorial professional took responsibility for the criminal charge against Parker, by way of providing a signature on the criminal complaint, where the

statements preceding the "Complainant" signature line read "The undersigned, certifying up information and belief, complains that in the County of San Diego, State of California, the Defendant(s) did commit the following crime(s)" and "I declare under penalty of perjury that the foregoing is true and correct and that this complaint, case number M267387, consists of 1 count."

133.   [FAC ¶ 30.] Defendants DOES 21-50 knowingly, wantonly, recklessly, intentionally and maliciously proceeded with and maintained prosecution of Plaintiff until March 17, 2022, with knowledge that the notice was unlawful, the arrest was without probable cause, and Plaintiff had not violated any law.

134.   Plaintiff alleges that Defendants DOES 21-50 were cognizant of the City of San Diego policies A and B that allowed initiation and maintenance of prosecutions by simple recitation of a statute and without certification and oath, and that Defendants believed themselves to be free from any of the safeguards that would flow from adherence to Cal. Penal Code § 740, and thus flouted their constitutional, professional, and ethical responsibilities in initiating and maintaining prosecution of Plaintiff without probable cause.

135.   [FAC ¶ 31.] The conduct of all Defendants named in this Fourth Cause of Action advanced, maintained, and prolonged the prosecution of Plaintiff under a charged crime without probable cause, in violation of Plaintiff's constitutional rights of due process under the Fourth Amendment and Fourteenth Amendment of the U.S. Constitution.

## JURISDICTION AND VENUE

136.   [FAC ¶ 32.] Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3) and (4), et. seq.

137.   [FAC ¶ 33.] Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiff's claims occurred in San Diego, California, within the Southern District.

<u>PARTIES</u>

138.   [FAC ¶ 34.] At all times relevant to this complaint, Plaintiff was an individual residing in San Diego County, California.

139.   [FAC ¶ 35.] At all times relevant to this complaint, Defendants MAYS, BECERRA, HOGAN, STECKLER, CALVERT, CRUZ, MCCLAIN, and DOES 1-20 were each individuals employed by SDSUPD and working in San Diego County, California.

140.   [FAC ¶ 36.] Plaintiff abandons his request for injunctive relief.

141.   [FAC ¶ 37.] At all times relevant to this complaint, Defendant the City of San Diego was a municipality operating in San Diego County, California.

142.   [FAC ¶ 38.] Plaintiff is truly ignorant of the true names and capacities of DOES 1 through 50, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

<u>DAMAGES</u>

143.   [FAC ¶ 48.] As a result of Defendants' malicious conduct, Plaintiff has suffered financial loss including lost work time and lost productivity in work time, and Plaintiff has suffered extreme emotional distress including but not limited to fear, anger, depression, worry, anxiety, sleeplessness, loss of ambition, and helplessness.

<u>PRAYER FOR RELIEF</u>

144.   WHEREFORE, Plaintiff prays for a judgment as follows:

1.  Entering judgment for compensatory general and special damages in an amount in accordance with proof, but in no case less than $1,500,000.

2. Entering judgment for exemplary damages against each of the individual defendants in an amount sufficient to punish and to make an example of said defendants, and to deter said defendants and others from engaging in similar conduct, and in no case less than $4,500,000.

3. Awarding reasonable attorney's fees, expenses, and costs of suit.

4. Granting such other and further relief as the Court deems proper.

<u>DEMAND FOR A JURY TRIAL</u>

Plaintiff demands a jury trial.

Dated:    August 23, 2024

Respectfully submitted,

Robert L. Parker, Ph.D.    _____

Plaintiff in pro per